**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA, ex rel. BILL
LOCKYER, in his official capacity
as Attorney General of the State
of California; JACK O'CONNELL, in
his official capacity as the State
Superintendent of Public
Instruction,

    *Plaintiffs-Appellees,*

ALLIANCE FOR CATHOLIC HEALTH
CARE,

    *Appellant,*

   v.

UNITED STATES OF AMERICA; U.S.
DEPARTMENT OF LABOR; ELAINE
CHAO, in her official capacity as
the Secretary of Labor;
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; TOMMY G.
THOMPSON, in his official capacity
as the Secretary of Health and
Human Services; UNITED STATES
DEPARTMENT OF EDUCATION;
MARGARET SPELLINGS, in her
official capacity as the Secretary
of Education,

    *Defendants-Appellees,*

   v.

No. 05-17292

D.C. No.
CV-05-00328-JSW

AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS AND GYNECOLOGISTS;
CHRISTIAN MEDICAL ASSOCIATION;
FELLOWSHIP OF CHRISTIAN PHYSICIAN
ASSISTANTS,
                    *Third-party-defendants.*

STATE OF CALIFORNIA, ex rel. BILL
LOCKYER, in his official capacity
as Attorney General of the State
of California; JACK O'CONNELL, in
his official capacity as the State
Superintendent of Public
Instruction,
                    *Plaintiffs-Appellees,*

                    v.

UNITED STATES OF AMERICA; U.S.
DEPARTMENT OF LABOR; ELAINE
CHAO, in her official capacity as
the Secretary of Labor;
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; TOMMY G.
THOMPSON, in his official capacity
as the Secretary of Health and
Human Services; UNITED STATES
DEPARTMENT OF EDUCATION;
MARGARET SPELLINGS, in her
official capacity as the Secretary
of Education,
                    *Defendants-Appellees,*

                    v.

No. 05-17312
D.C. No.
CV-05-00328-JSW
OPINION

AMERICAN ASSOCIATION OF PRO-LIFE
OBSTETRICIANS AND GYNECOLOGISTS;
CHRISTIAN MEDICAL ASSOCIATION;
FELLOWSHIP OF CHRISTIAN PHYSICIAN
ASSISTANTS,
          *Third-party-defendants-*
                    *Appellants.*

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
May 19, 2006—San Francisco, California

Filed June 9, 2006

Before: Betty B. Fletcher, Alex Kozinski and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Kozinski

## COUNSEL

James F. Sweeney, Sweeney & Greene LLP, Sacramento, California, for appellant Alliance of Catholic Health Care.

Steven H. Aden, M. Casey Mattox, Center for Law and Religious Freedom of the Christian Legal Society, Springfield, Virginia, for appellants Christian Medical Association et al.

Antonette B. Cordero, Deputy Attorney General, Los Angeles, California, for the plaintiffs-appellees.

August E. Flentje, Assistant United States Attorney, Washington, DC, for the defendants-appellees.

## OPINION

KOZINSKI, Circuit Judge:

We consider whether health care providers are entitled to intervene in a case challenging the constitutionality of a federal appropriations rider enacted to protect their interests.

## Facts

California, like a number of other states, has a statute that compels emergency health care providers to deliver medical

services "for any condition in which the person [seeking such services] is in danger of loss of life, or serious injury or illness." Cal. Health & Safety Code § 1317(a). The statute makes no exception for abortion services and can therefore be understood to mandate such services when needed to preserve the life or health of the patient.

In 2004, Congress attached a rider to an appropriations bill, in an effort to dissuade states from forcing health care providers to offer abortion services. *See* Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809 (2005). The rider, dubbed the Weldon Amendment after its sponsor, Congressman (and Doctor) Dave Weldon, prevents federal, state and local governments from receiving certain federal funds if they discriminate against health care providers that refuse to provide, pay for, provide coverage of, or refer for abortions.[1] *See id.* Div. F, § 508(d), 118 Stat. at 3163.

In light of the Weldon Amendment, enforcement of California Health and Safety Code section 1317 would arguably make California ineligible for certain federal funds. This caused California to bring suit in federal court seeking a declaration that the Amendment is unconstitutional on the grounds that it exceeds Congress's spending power and

---

[1]The portion of the Weldon Amendment at issue in this case reads:

> (1)   None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

> (2)   In this subsection, the term "health care entity" includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan.

*Id.* § 508(d), 118 Stat. at 3163.

authority and violates the Fifth and Tenth Amendments. Alternatively, the state sought a declaration that enforcement of section 1317 would not disqualify it from receiving federal funds otherwise available under the Consolidated Appropriations Act. While the Weldon Amendment does not, technically, compel California to refrain from enforcing section 1317 against doctors who refuse to perform abortions, California argues that, as a practical matter, it will be precluded from so enforcing its law for fear of losing billions in federal aid. In support of this theory, the state presented an affidavit from its Attorney General stating that, so long as the Weldon Amendment is in place, he "will have no choice but to refrain from exercising [his] authority to enforce California's police powers."

Among the arguments raised by the United States in this litigation is that California lacks standing because it faces no imminent threat that the Weldon Amendment will be enforced against it, in part because it has not shown any plans to enforce section 1317. In response, the state argued as follows in its brief below:

> [F]ollowing the passage of the Weldon Amendment, the California Attorney General's Office has received complaints about two women allegedly being denied emergency abortion-related medical services at a California Hospital. These complaints have been referred to the California Department of Health Services, and this state agency *will initiate an investigation* into the complaints pursuant to its statutory authority under the California Health and Safety Code.
>
> That these complaints have been received by the California Attorney General's Office document [sic] that California's need to enforce Health and Safety Code section 1317 is not "unforeseeable," as defendants would have this Court believe. Instead, the

> undisputed evidence in this case shows that state officials *are already receiving information about alleged denials of emergency abortion-related medical services* in California . . . .

Plaintiffs' Combined Opposition to Cross-Motion for Summary Judgment and Reply, at 6 (emphasis added) (internal citations omitted).

Two separate groups—the appellants here—sought to intervene both as of right, *see* Fed. R. Civ. P. 24(a), and with the district court's permission, *see id.* 24(b). The first group, the Alliance of Catholic Health Care, is a non-profit health care association representing Catholic health care providers in California. Alliance members object to providing *any* abortion service, even when essential to preserving the health or life of the mother. The other entity, known as the Medical Groups, consists of several pro-life organizations whose members will provide abortion services only in a very small class of emergencies. The Medical Groups contend that their members risk being prosecuted under section 1317 because they take a far narrower view than does California of what constitutes a medical emergency justifying an abortion.

The existing parties opposed intervention and the district court ruled in their favor. Finding that the proposed intervenors did not have a significant protectable interest in the case, and that disposition of the case would not impede their ability to protect their interests, it denied intervention both as of right and as a discretionary matter. This appeal followed.

**Analysis**

**[1]** On appeal, appellants challenge only the denial of intervention as of right under Rule 24(a). Intervention as of right is governed by Federal Rule of Civil Procedure 24(a)(2). We construe Rule 24(a) liberally in favor of potential intervenors. *Sw. Ctr. for Biological Diversity* v. *Berg*, 268 F.3d 810, 818

(9th Cir. 2001). In determining whether intervention is appropriate, we apply a four-part test:

> (1)   the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

*Sierra Club* v. *EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993). Appellees concede that the intervention motions were timely, so we address only the last three factors.

   **[2] 1.** "An applicant has a 'significant protectable interest' in an action if (1) it asserts an interest that is protected under some law, and (2) there is a 'relationship' between its legally protected interest and the plaintiff's claims." *Donnelly* v. *Glickman*, 159 F.3d 405, 409 (9th Cir. 1998). The United States forthrightly conceded at oral argument what seems beyond dispute—that Congress passed the Weldon Amendment to protect health care providers like those represented by the proposed intervenors: "They are the intended beneficiaries of this law using the encouragement of Congress's spending power to try and protect their conscience rights."

   The proposed intervenors' interest thus is neither "undifferentiated" nor "generalized." *See United States* v. *Alisal Water Corp.*, 370 F.3d 915, 920 (9th Cir. 2004) (quoting *Public Service Corp.* v. *Patch*, 136 F.3d 197, 205 (1st Cir. 1998)). For the health care providers represented by proposed intervenors, the Weldon Amendment provides an important layer of protection against state criminal prosecution or loss of their medical licenses. If the Weldon Amendment is declared unconstitutional or substantially narrowed as a consequence of this litigation, they will be more likely to be forced to

choose between adhering to their beliefs and losing their professional licenses. Such an interest is sufficiently "direct, non-contingent, [and] substantial." *Dilks* v. *Aloha Airlines, Inc.*, 642 F.2d 1155, 1157 (9th Cir. 1981) (per curiam).

California and the United States point out that the Weldon Amendment does not give the proposed intervenors any enforceable rights, nor does it seek to protect any of their existing legal rights. However, our intervention caselaw has not turned on such technical distinctions. Rather, we have taken the view that a party has a sufficient interest for intervention purposes if it will suffer a practical impairment of its interests as a result of the pending litigation.

In *County of Fresno* v. *Andrus*, 622 F.2d 436 (9th Cir. 1980), for example, the underlying litigation concerned a federal statute passed to protect small farmers on lands receiving federally subsidized water. The statute did not confer any rights on the small farmers; instead, it required owners of larger farms, as a condition of receiving federally subsidized water, to dispose of any excess land over a certain acreage at below-market rates. *Id.* at 437. In allowing the small farmers to intervene, we noted that "[w]e have rejected the notion that Rule 24(a)(2) requires a specific legal or equitable interest," and that the small farmers were "precisely those Congress intended to protect" with the statute. *Id.* at 438.

**[3]** The proposed intervenors' interest in the litigation here is at least as substantial as that of the farmers in *County of Fresno*. Congress passed the Weldon Amendment precisely to keep doctors who have moral qualms about performing abortions from being put to the hard choice of acting in conformity with their beliefs, or risking imprisonment or loss of professional livelihood. And the Amendment appears to have had its intended effect: The state, in its complaint, contends that the Weldon Amendment "is so broad and severe as to leave the Plaintiffs with no choice but to accede to Congress's dictates." That Congress chose to use its spending power as

a lever, rather than passing legislation granting affirmative rights to those represented by the proposed intervenors, is of no consequence. The Weldon Amendment effectively shields the proposed intervenors and their members from the difficult moral choice to which enforcement of section 1317 could otherwise subject them. The fact that California brought this lawsuit seeking to invalidate the Amendment, or restrict its sweep, is proof in itself of the efficacy of this congressional enactment and its significance to the proposed intervenors.

The interest of the proposed intervenors here is far more direct than that of the proposed intervenors in *Donnelly*. In that case, which had been brought by female Forest Service employees, male Forest Service employees sought to intervene to assert their own claims of gender-based discrimination. *See* 159 F.3d at 407. We concluded the fate of the women's claims wouldn't affect the men's claims at all, so we denied intervention on the grounds that the men's interests were unrelated to the underlying litigation. *Id.* at 409-10. In contrast, this case will determine conclusively whether, and the degree to which, the Weldon Amendment handcuffs states that would force health care providers to perform abortions.

**[4] 2.** Having found that appellants have a significant protectable interest, we have little difficulty concluding that the disposition of this case may, as a practical matter, affect it. *See Berg*, 268 F.3d at 822 ("We follow the guidance of Rule 24 advisory committee notes that state that '[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.' " (alteration in original) (quoting Fed. R. Civ. P. 24 advisory committee note to 1966 amendment)). Should California prevail in this lawsuit, it will be free to prosecute health care providers for failure to provide emergency abortion services, however it defines that phrase. California's argument that proposed intervenors have failed to show that section 1317 is being actively enforced against health care providers who refuse to perform abortions is

fatally undermined by the state's own evidence demonstrating that its employees are investigating complaints that a hospital has failed to provide emergency abortions. *See* p. 6724 *supra*. The same evidence that bolsters the state's standing to sue also bolsters the case for intervention.

Even if this lawsuit would *affect* the proposed intervenors' interests, their interests might not be *impaired* if they have "other means" to protect them. *Alisal*, 370 F.3d at 921. In *Alisal*, the United States sought to place the defendant in receivership to remedy environmental violations it had committed. One of the defendant's judgment creditors tried to intervene because it feared that the receiver's power to veto outlays would impair its ability to enforce its judgment. *Id.* at 918. We held that litigation would not impair the creditor's interests because the district court had set up a separate process for approving claims against the debtor that was sufficient to protect the proposed intervenor's interests. *Id.* at 921. By contrast, proposed intervenors here have no alternative forum where they can mount a robust defense of the Weldon Amendment. *See* p. 6730 *infra*.

*United States* v. *City of Los Angeles*, 288 F.3d 391 (9th Cir. 2002), on which California relies, is not particularly helpful to it. That case involved a lawsuit by the United States seeking to enjoin certain police practices. A number of community groups sought to intervene seeking to protect the rights of their members to be free from unconstitutional police practices. We denied intervention on another ground, but noted it was "doubtful" that these proposed intervenors had shown their interests would be impaired by the litigation because the lawsuit did not "prevent any individual from initiating suit against LAPD officers who engage in unconstitutional practices or against the City defendants for engaging in unconstitutional patterns or practices." *Id.* at 402.

California's reliance on this passing comment in *City of Los Angeles* is misplaced. The comment does not amount to

a holding because nothing in the case turned on it. And in any event, the comment is entirely unhelpful to the opponents of intervention here. The community groups in *City of Los Angeles*, after all, were not precluded by the pending litigation from bringing their own lawsuits to enjoin or seek damages for unconstitutional police practices. By contrast, the proposed intervenors here have no such opportunity. Because the Weldon Amendment is a spending measure and thus gives the proposed intervenors no enforceable rights, they would be unable to bring a separate suit where they could argue for a broad reading of the Amendment. *Cf. Massachusetts (Frothingham)* v. *Mellon*, 262 U.S. 447, 487-88 (1923) (holding that taxpayers generally lack standing to contest public expenditures); *Flast* v. *Cohen*, 392 U.S. 83, 105-06 (1968) (carving out a narrow exception to *Frothingham* for Establishment Clause challenges). The argument raised by both of the existing parties that the proposed intervenors and their members could raise the issue as a defense if they are ever prosecuted by the California authorities for violating section 1317 is no more persuasive. Setting aside whether the ability to raise a defense in a criminal prosecution is *ever* an adequate substitute for settling a legal issue ahead of time and avoiding prosecution altogether, the simple answer to this argument is that a spending measure such as the Weldon Amendment can't possibly be used as a defense in a prosecution for a state crime.

While *City of Los Angeles* does not support the view that intervention is inappropriate here, another aspect of the case actually helps the proposed intervenors. In addition to the community groups there, the designated bargaining unit for the police officers also sought to intervene in the litigation. 288 F.3d at 396. While denying intervention to the community groups, we granted intervention to the bargaining unit because the proposed consent decree in the case purported to give the district court authority to override the officers' collective bargaining agreement. *Id.* at 401. In granting intervention, we noted that once the consent decree was entered, the

officers would have no alternative forum to protect their rights. *Id.* The proposed intervenors here are in much the same position. If, as a result of this litigation, the Weldon Amendment is struck down, or its sweep is substantially narrowed, the proposed intervenors will have no alternative forum in which they might contest that interpretation of the Amendment.

**[5] 3.** Finally, we turn to whether the United States will adequately represent the proposed intervenors' interests in this action. We have observed that "[w]hen an applicant for intervention and an existing party have the same ultimate objective, a presumption of adequacy of representation arises." *Arakaki* v. *Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). Moreover, "[t]here is also an assumption of adequacy when the government is acting on behalf of a constituency that it represents. In the absence of a 'very compelling showing to the contrary,' it will be presumed that a state adequately represents its citizens when the applicant shares the same interest." *Id.* (quoting 7C Charles Alan Wright, et al., Federal Practice and Procedure: Civil 2d § 1909, at 332 (2d ed. 1996)) (internal citation omitted). Arguably, this principle is nowhere more applicable than in a case where the Department of Justice deploys its formidable resources to defend the constitutionality of a congressional enactment. *See generally* Seth P. Waxman, *Defending Congress*, 79 N.C. L. Rev. 1073 (2001).

**[6]** Here, however, the United States and the proposed intervenors have distinctly different, and likely conflicting, interests. "Often, defending Acts of Congress leads the Solicitor General to lean heavily on the *Ashwander* principle of construing a statute so as to avoid constitutional doubt." *See id.* at 1079-80 (citing *Ashwander* v. *TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring)). We have recognized that willingness to suggest a limiting construction in defense of a statute is an important consideration in determining whether the government will adequately represent its constituents'

interests. *See Prete* v. *Bradbury*, 438 F.3d 949, 958 (9th Cir. 2006).

Of course, just because the government theoretically may offer a limiting construction of a statute that is narrower than that of a party proposing intervention does not mean that the party has overcome the presumption of adequacy of representation. In order to make a "very compelling showing" of the government's inadequacy, the proposed intervenor must demonstrate a likelihood that the government will abandon or concede a potentially meritorious reading of the statute.

Here, there is a limiting construction that the government could advocate that might assuage many of the constitutional doubts clouding the Weldon Amendment: The Weldon Amendment does not reach statutes like California Health and Safety Code section 1317 that do not facially discriminate against health care providers who refuse to provide abortion services. Section 1317, after all, speaks in terms of health care providers that fail to provide *any* emergency service; it does not single out abortion for special treatment.

**[7]** That the government will offer such a limiting construction of the Amendment is not just a theoretical possibility; it has already done so. In its motion for summary judgment, the United States suggested that "because § 1317 applies to medical emergencies involving any life-threatening or other serious condition, and not simply abortions, it does not on its face constitute discrimination within the meaning of the Weldon Amendment." And it has indicated that it may adopt the position that "enforcement of a facially neutral state statute such as § 1317 (which applies to all emergency medical services, not simply abortions) [does not] constitute discrimination under the Weldon Amendment." By contrast, the proposed intervenors take the position that the Weldon Amendment must be read broadly to cut off federal funding to any state that uses facially neutral laws—such as section 1317—to

force health care providers to perform abortions when they are unwilling to do so.**²**

**[8]** These are far more than differences in litigation strategy between the United States and the proposed intervenors. *See City of Los Angeles*, 288 F.3d at 402-03 ("[M]ere[ ] differences in strategy . . . are not enough to justify intervention as a matter of right."). They go to the heart of the defense of the Weldon Amendment. By making the strident argument that section 1317 is irreconcilably in conflict with the Weldon Amendment, the proposed intervenors bring a point of view to the litigation not presented by either the plaintiffs or the defendants.

**[9]** We therefore conclude that the proposed intervenors in this case, like those in *Forest Conservation Council* v. *United States Forest Service*, 66 F.3d 1489, 1499 (9th Cir. 1995), have "more narrow, parochial interests" than the United States. Through the presentation of direct evidence that the United States will take a position that actually compromises (and potentially eviscerates) the protections of the Weldon Amendment, the proposed intervenors have overcome the presumption that the United States will act in their interest.

* * *

**[10]** The proposed intervenors have a significant protectable interest at stake in this case that could be impaired by the outcome. They have no other means to protect this interest, and no current party adequately represents it. We therefore reverse and remand with instructions that both proposed inter-

---

**²**As noted, the two proposed intervenors have somewhat different interests, in that Alliance members will *never* provide abortion services, whereas Medical Groups members will do so in certain limited circumstances. This difference is of no moment here because both groups suggest an interpretation of the Amendment that is far broader than that advocated by the United States.

venors be made parties to the litigation aligned with the defendant. The district court should take all reasonable steps to put the new parties on an equal footing with the original parties. Because the district court will soon hear arguments on the cross-motions for summary judgment, time is of the essence; the clerk is instructed to issue the mandate forthwith.

**REVERSED AND REMANDED.**